D. Paul LOUKAS, Appellee

v.

Shahnawaz M. MATHIAS, Eastern
Development & Design, Inc., and
Slater & West, Inc., Appellants.

Superior Court of Pennsylvania.

Submitted March 26, 2007.
Filed July 12, 2007.
Reargument Denied Sept. 21, 2007.

Eugene R. Campbell, York, for appellants.

Andrew J. Miller, York, for appellee.

BEFORE: HUDOCK, JOYCE and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellants Shahnawaz M. Mathias, Eastern Development & Design, Inc., and Slater & West, Inc.,[1] appeal the order granting Appellee D. Paul Loukas' petition for deficiency judgment. We reverse.

¶ 2 A review of the record establishes that Appellee obtained a judgment against Appellants in the United States District Court for the Eastern District of Virginia in the amount of $93,860.50, plus interest and costs. On October 18, 2004, Appellee transferred the judgment in the accrued amount of $109,089.91 to York County, Pennsylvania. On October 22, 2004, Appellee began execution on the judgment against 47.12 acres of unimproved real es-

---

1. For edification purposes, Appellant Shahnawaz Mathias owns Appellant Eastern Development & Design, Inc. and Appellant Slater & West, Inc. N.T. Deficiency Judgment, 9/25/06, at 30.

tate owned by Appellants in West Manchester Township and known as the Greens at Westgate.

¶ 3 On April 18, 2005, the property was sold at sheriff sale to Appellee for sheriff's costs of $2,872.43. On April 21, 2005, Appellants filed a motion to set aside the sheriff sale, which motion was denied after a hearing. Appellants' appeal to this Court resulted in an affirmance of the trial court's actions. *Eastern Development & Design, Inc., et al. v. Loukas*, 894 A.2d 826 (2005). This was followed by the sheriff of York County issuing and recording a deed in the name of Appellee's bid assignee, SPL Properties, LP, which is a limited partnership owned by Appellee to hold fee simple title to the Greens at Westgate. Appellee paid costs and transfer taxes upon recordation of the sheriff's deed. Appellee also filed a petition pursuant to the Deficiency Judgment Act (42 Pa.C.S.A. § 8103), which generated a hearing on September 25, 2006, where Appellee and his expert (Thomas Meager) gave testimony in favor of the petition, while Appellant Mathias testified contrary to the deficiency judgment. After the September 25th hearing, the trial court entered an order granting Appellee's petition for a deficiency judgment. 42 Pa.C.S.A. § 8103(c)(4) (if an answer is filed and testimony produced alleging the fair market value in excess of the amount stated in the petition, the trial court will hear the evidence and determine and fix the fair market value). The present appeal followed raising the question: "Did the lower court err in finding that the value of the real estate was exceeded by the value of the liens against it?" Appellants' brief, at v. We read Appellants' claim to be one asking whether there is sufficient evidence to support the trial court's holding that the liens, taxes, and costs against the real estate exceeded its fair market value to allow entry of a deficiency judgment in favor of Appellee.

¶ 4 The initial duty and authority to determine fair market value under the petition of the kind present here lies with the fact-finder, the trial court. Our review is limited to deciding whether there is sufficient evidence to sustain the holding of the trial court, or whether there is a reversible error of law. *First Pennsylvania Bank, N.A. v. Peace Valley Lakeside Community and Agricultural Trust, Inc.*, 329 Pa.Super. 218, 478 A.2d 42 (1984); *Cheltenham Federal Savings and Loan Association v. Pocono Sky Enterprises, Inc.*, 305 Pa.Super. 471, 451 A.2d 744 (1982); *Shrawder v. Quiggle*, 256 Pa.Super. 303, 389 A.2d 1135 (1978). Recognizing our limited authority on appeal, and our deference in most cases to the trial court's determination based upon its first-hand observation of the witnesses, we are nevertheless of the opinion that the trial court's finding and order are not consistent with the evidence.

¶ 5 The pertinent testimony presented to the trial court at the hearing to fix fair market value began with Appellee stating there were liens against the property (*i.e.*, Mooring Capital Fund, LLC held a first mortgage in foreclosure with a balance of $1,492,039.55), sheriff's costs ($2,872.43), and transfer taxes and recording fees ($37,578.66). *See* N.T. Deficiency Judgment, 9/25/06, at 7–10; *see also* footnote 5, *infra.* On cross-examination, Appellee agreed that the 2006 York County assessment ($1,967,490.00) and his appraisal ($1,970,000.00) were "close" in value. *Id.* at 12; *see also id.* at 23–24 (Appellee's expert testified to the same valuations).

¶ 6 The second witness to testify was Thomas Meager, an expert employed by Appellee to prepare a real estate appraisal of the property on February 21, 2006. In doing so, the expert considered the highest and best use of the realty and developed a sales comparison approach before deduc-

ing a value conclusion of $1,970,000.00.[2] *See* Appellee's "Real Estate Appraisal," 2/24/06, at 18; N.T. Deficiency Judgment, 9/25/06, at 15, 16. Meager's evaluation was influenced by the fact that 50 percent of the property could not be developed given that it had some steep slopes, some wetlands, and a large utility easement that ran through it. *Id.* at 16. Moreover, Meager did not use a cost approach or a capitalization approach to do the appraisal because the property had no improvements. The expert also opined that an income capitalization approach could not be used because the land was vacant and had no income potential until developed. *Id.* at 17. Further, the fact that the sheriff's sale date was on April 18, 2005, and the appraisal date was on February 21, 2006, did not cause Meager to change his appraisal figure for the open space, undeveloped residential acreage. Lastly, Meager reviewed the content of his appraisal report and the manner in which he arrived at fair market value for the property after discounting it for: 1) topography; 2) lack of approvals for development as of February of 2006; and 3) liens on the property that would create potential clouds on the title. *See* footnotes 5 and 7, *infra.*

¶ 7 Prior to the September 25, 2006 hearing, Appellee filed a memorandum containing the methodology to ascertain fair market value and the credit/debit calculations to reach the "Adjusted Sale Price of $1,856,060.77;" to-wit:

## III. DETERMINATION OF DEFICIENCY AMOUNT

*The [trial c]ourt must first determine the fair market value of the Greens at Westgate based on evidence submitted at the hearing, including* the expert testimony and appraisal to be submitted by [Appellee]. The [trial c]ourt should consider relevant sales comparisons and also consider evidence submitted about the state of title to the property and *the detrimental effect of uncertainty about surviving liens and potential litigation over title.*

The [trial c]ourt must next determine the adjustments or credits that must be added to the sale price by the judgment creditor. *See* 42 Pa.C.S. § 8103(c)(5). In addition to the actual sale price, [Appellee] should be credited with the transfer taxes and recording costs paid on the sheriff deed. [Appellee] should also be credited with: (1) the federal and state tax liens entered of record against [Appellant] Mathias prior to the sheriff sale; (2) the municipal taxes on the property that were accrued as of the date of the sheriff's sale; and (3) the outstanding first mortgage lien which Mooring [Capital Fund, LLC] now seeks to enforce against the property. The sale price, plus applicable credits[,] results in an adjusted sale price.

Finally, the [trial c]ourt should take the fair market value and subtract the adjusted sale price to obtain an adjusted fair market value. This would be the value of the property taking into consideration the costs actually paid by [Appellee] and any liens which may have been assumed by [Appellee]. The difference between [Appellee's] original judgment amount and this adjusted fair market value should then be fixed as the deficiency judgment, which amount will be a continuing judgment against [Appellants].

---

**2.** Meager's comparable sales approach of four units of property resulted in a value range of $1,840,000.00 to 2,190,000.00, which reduced itself to a middle/mean range of $1,970,000.00. N.T. Deficiency Judgment, 9/25/06, at 16, 26. This translated into a value of $41,900.00 per acre. *Id.* at 26.

Here, *[Appellee] proposes to introduce evidence to support the calculations as follows:*

| | |
|---|---:|
| Appraised Value [by Appellee's expert] | $1,970,000.00 |
|    Adjustment for uncertainty of title | (197,000.00) |
| Fair Market Value | $1,773,000.00 |
| Sale Price | 2,872.43 |
|    Plus transfer tax & recording fees | 37,578.06 |
|    Mooring claim [n.2] | 1,521,281.55 |
|    Federal taxes | 91,447.78 |
|    State taxes | 23,328.71 |
|    Municipal taxes | 179,552.24 |
| Adjusted Sale Price | $1,856,060.77 |

[n. 2] This claim [a first mortgage to Mooring Capital Fund, LLC] as of October 1, 2004 was $1,492,039.55, plus per diem interest of $146.21 through April 18, 2005.

Appellee's, "Hearing Memorandum," 9/21/06, at 5, n. 2 (emphasis added); Record No. 8. The trial court adopted the expert's appraised value of the property and the foregoing outline as "correct" to reach an identical adjusted sale price as that offered by Appellee; to-wit:

> The fair market value of the property is to be determined as of the date of the sheriff sale. To determine the fair market value, the [trial c]ourt must consider recent sales of comparable location and description, uses to which the property is adapted and might reasonably be applied, demand for the realty, and income produced by it and any other factors which may influence the property value.
>
> *We determined the fair market value of the Greens at Westgate to be $1,773,000.00, based on evidence submitted at the hearing.* We then determined the credits added to the sale price paid by [Appellee], including transfer taxes and recording costs paid on the sheriff deed, the federal and state tax liens entered of record against Appellants prior to the sheriff sale, the municipal taxes on the property that were accrued as of the date of the sheriff sale, and the outstanding first mortgage lien which Mooring [Capital Fund, LLC] now seeks to enforce against the property. The sale price of $2,872.43, plus applicable costs, results in an adjusted price of $1,856,060.77.
>
> Finally, we subtracted the adjusted price of $1,856,060.77 from the fair market value of $1,773,000.00 to obtain an adjusted fair market value of $83,060.77. [Appellee's] judgment amount of $109,089.91 less the adjusted fair market value results in a deficiency judgment amount of $109,089.91, because the deficiency judgment amount may not exceed the original judgment amount. We find no error in our calculations[.]

Trial court opinion, 11/28/06, at 3–4 (emphasis added); *see also* Trial court's Order filed 9/26/06 ("We believe that the calculation cited by [Appellee] in his hearing memorandum is correct. We believe that they have backed up the figures listed in their calculations on page five and six of their memorandum through testimony, and, accordingly, we'll enter an order giving [Appellee] deficiency judgment and fixing it at the sum of $109,089.91."); Record No. 2. Unlike the trial court, we find error in its calculations, which has its genesis in a lack of factual support for the legal conclusion of a deficiency judgment.

¶ 8 More specifically, we have difficulty with the trial court embracing as accurate the tabulations cited in Appellee's memorandum because Appellee "propose[d] to introduce evidence to support the calculations" in the memorandum, *e.g.*, "Adjustment of uncertainty of title" in the amount of $197,000.00 was to be buttressed by evidence, but the "uncertainty of title" factor was not explained by either Appellee or his expert at the September 25th hearing. To elaborate, we cite the following:

[Appellee's counsel:]

Q. And you had previously today listened to testimony about other potential liens that were on the property on

the date of the sheriff's sale.[3] Would there be any additional discount, if any, and what additional discount would you apply to this property based on other potential clouds on the title?

[Appellee's expert/Meager:]

A. I think if the property is not marketable for an extended period of time, there would obviously be some kind of discount necessary because of that. Other properties I've looked at have been anywhere from 10 to 20 percent depending on the time frame that it would take to be—you know, for the property to be marketable. Anybody purchasing the property would, you know, obviously have significant holding costs until such time they could do anything with it, so that would have to be discounted.

Q. And would you just briefly describe what some of your—what some of the concerns would be as a result of those other potential clouds on title?

A. I think the biggest thing is, you know, the delay that—to do anything with the property, if it took a year or two years before anything could be done before it could have clear title to be resold or developed, and I think somebody would place some type of relatively significant discount on the property.

Q. Would the existence of a pending foreclosure action on the property cause you concern as well?

A. Yeah, along the same lines, not being able to market the property for an unknown period of time.

Q. And finally, your report is dated as of February 24, 2006; is that correct?

A. Correct.

Q. Would you anticipate or would there be any substantial deviation from the value on your report as of the date of the sheriff's sale April 18, 2005?

A. No.

[Appellee's counsel:] I believe that's all Your Honor.

---

**3.** The only potential liens testified to as affecting the real estate's market value at the time of the sheriff's sale consisted of: 1) Mooring Capital Fund, LLC—$1,492,039.55; 2) federal taxes—approximately $90,000.00; and 3) real estate taxes—$86,258.75. N.T. Deficiency Judgment, 9/25/06, at 5–7. Appellee also introduced into evidence Exhibit 7 (tax certification from the tax claim bureau), Exhibit 8 (real estate taxes for the township, school district, and York County), and Exhibit 9 (sheriff's costs of $2,872.43 listed in the deed, as well as the transfer tax and recording costs of $37,578.06). *Id.* at 8–10. The mortgage held by Susquehanna Mortgage Bankers Corporation was stipulated by the parties as satisfied. *Id.* 39–40. Interestingly, nowhere in the official record forwarded to this Court are the exhibits cited-above to be found. Even though Appellants stipulated to the admission of the exhibits, their absence from the record precludes this Court from giving credence to their content. *Commonwealth v. Young,* 456 Pa. 102, 115 & n. 15, 317 A.2d 258, 264 & n. 15 (1974) (holding that on appellate review, a court may not consider facts outside the record); *Commonwealth v. Rini,* 285 Pa.Super. 475, 427 A.2d 1385, 1386 (1981) (same); *McCormick v. Allegheny General Hospital,* 364 Pa.Super. 210, 527 A.2d 1028, 1033 (1987) (same). Even if, for the sake of argument, we were to accept as valid the content of the exhibits submitted by Appellee, the costs referenced therein have not been linked to the "adjustment for the uncertainty of title" listed in Appellee's hearing memorandum as affecting the merits of the deficiency judgment petition. And, Mooring Capital Fund, LLC's foreclosure figures, as well as the federal taxes, state taxes, municipal taxes, and recording fees are already accounted for in Appellee's hearing memorandum as separate items of cost influencing the fair market value of the property, but none is tied to the "adjustment for the uncertainty of title" figure.

N.T. Deficiency Judgment, 9/25/06, at 17–19.[4] As is evident from the preceding exchange, the element of "uncertainty of title" affecting valuation is not "quantified" through testimony to give substance to Appellee's reference in his memorandum "to introduce evidence to support the calculations [ . . . ] [of] adjustment for uncertainty of title ($197,000.00)[.]" See Appellee's "Hearing Memorandum," 9/21/06, at 5; Record No. 8.

¶ 9 We have assiduously reviewed the hearing transcript and find no support therein for Appellee's figure of $197,000.00 juxtaposed to the "adjustment for uncertainty of title" amount or the trial court's endorsement of the same. See N.T. Deficiency Judgment, 9/25/06, at 48. This void in the record undermines the trial court's predicate figure of $1,773,000.00 ($1,970,-000.00 minus $197,000.00 = $1,773,000.00) utilized to calculate the adjusted fair market value of $83,060.77 ($1,856,060.77 minus $1,773,000.00 = $83,060.77), and the ultimate deficiency judgment amount of $109,089.91.[5] Contrast Northeastern Bank of Pennsylvania v. Wilkins, 440 Pa.Super. 436, 655 A.2d 1028 (1995) (where no evidence/testimony presented to object to fair market value, trial court erred in not accepting appraised value).

¶ 10 At bar, no evidence was presented itemizing the makeup of the $197,000.00 figure during the fair market value hearing or in the expert's real estate appraisal.[6] For us to adopt Appellee's "adjustment for uncertainty of title" figure absent any facts to buttress its authenticity would be the equivalent of affirming the trial court's deficiency judgment order without support in the record. This we will not do. See Lilly v. Markvan, 563 Pa. 553, 557, 763 A.2d 370, 372 (2000) ("If a decision is based on 'findings which are without factual support in the record,' however, the reviewing court will not hesitate to reverse." (citation omitted)); Bortz v. Noon, 556 Pa. 489, 497, 729 A.2d 555, 559 (1999) ("A reviewing court [ . . . ] is not bound by findings which are without support in the record [ . . . ]." (citations omitted)); see also West Chester Area School District v. Collegium Charter School, 571 Pa. 503, 527, 812 A.2d 1172, 1186 (2002) (taxpayers "taxation without representation" claim was based on mere conjecture as there was no evidence of record to support such a claim); Commonwealth v. Marshall, 570 Pa. 545, 572, 810 A.2d 1211, 1227 (2002) (Appellant argued that the trial court's appointment of psychological testing was improper; the record did not support this representation of

---

4. We note that on re-direct examination Appellee's expert acknowledged that the Mooring Capital Fund, LLC's complaint in mortgage foreclosure listed a premium interest rate of $1,146.21, and this potentially created a lien on the property that would be a carrying cost for Appellee. See N.T. Deficiency Judgment, 9/25/06, at 27. Nonetheless, this in no way explicates the $197,000.00 listed by Appellee as "adjustment for uncertainty of title" in the hearing memorandum.

5. Appellant Mathias denied Appellee's fair market figure in print. See Appellants' "Answer to Petition for Deficiency Judgment," 3/2/06, ¶ 11; Record No. 12. Further, Appellant Mathias contested the expert's belief that

50 percent of the property could not be developed and he was also challenging the validity of Mooring Capital Fund, LLC's foreclosure action. N.T. Deficiency Judgment, 9/25/06, at 31–32, 36–37.

6. In fact, the expert's appraisal of $1,970,000.00 "assumes a good and marketable title. The identified real property was appraised as though free and clear of any indebtedness and other liens and encumbrances that may be identified on the public record." Appellee's "Real Estate Appraisal," 2/24/06, at 2 (unnumbered); Exhibit 10 attached to Deficiency Judgment transcript dated 9/25/06; Record No. 6.

the facts and as such the issue was held to have no merit).

■ ¶ 11 With Appellee's failure to present facts of record justifying the trial court's order granting his petition for deficiency judgment, we find that the sheriff's sale of the property (now bolstered in value by the unwarranted deduction of $197,000.00) satisfies Appellee's monetary judgment ($109,089.91) against Appellants. To achieve this end, the order appealed is reversed, and the case is remanded for further proceedings to re-determine fair market value on a basis consistent with this Opinion.[7] *See Cheltenham Federal Savings and Loan Association, supra.*

¶ 12 Order reversed. Case remanded with directive. Jurisdiction relinquished.

7. The objective of the Deficiency Judgment Act "is to relieve a debtor of further personal liability to the creditor, if the real property taken by the creditor on an execution has a fair market value, as of the date of the execution sale, sufficient so that the creditor may dispose of the property to others (or even, sometimes, use it himself) without a net loss to the creditor. *See Phillip [Philip] Green & Son, Inc. v. Kimwyd, Inc.,* 410 Pa. 202, 205,

189 A.2d 231 (1963)." *Cheltenham Federal Savings and Loan Association,* 451 A.2d at 748.

Herein, disallowing the deduction of $197,000.00 from the equation to determine fair market value creates a surplus in excess of Appellee's claimed $109,089.91 judgment, which renders a deficiency judgment inappropriate.